IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TY A. LAVENIA, | ) | CASE NO. 3:21-CV-674 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |

Plaintiff, Ty Lavenia ("Plaintiff" or "Lavenia"), challenges the final decision of Defendant, Kilolo

Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying his application for a Period of

Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42

U.S.C. §§ 416(i) & 423 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This

case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under

Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate

Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In October 2018, Lavenia filed an application for POD and DIB, alleging a disability onset date of

April 1, 2018 and claiming he was disabled due to a back injury.  (Transcript ("Tr.") at 244, 279).  The

application was denied initially and upon reconsideration, and Lavenia requested a hearing before an

administrative law judge ("ALJ").  Tr. 187.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On August 11, 2020, an ALJ held a hearing, during which Lavenia, represented by counsel, and an impartial vocational expert ("VE") testified.  Tr. 77-98.  On September 1, 2020, the ALJ issued a written decision finding that Lavenia was not disabled.  Tr. 40-56.  The ALJ's decision became final on January 19, 2021, when the Appeals Council declined further review.  Tr. 1-4.

On March 25, 2021, Lavenia filed his Complaint to challenge the Commissioner's final decision.  Doc. No. 1.  The parties have completed briefing in this case.  Doc. Nos. 13, 17.  Lavenia asserts the following assignments of error:

> (1)  The ALJ failed to properly evaluate Mr. Lavenia's severe impairments when constructing the residual functional capacity.
>
> (2)  The ALJ violated 20 C.F.R. § 404.1520c when evaluating the opinions of the treating source, Dr. Thompson.

Doc. No. 13, p. 1.[2]

## II. EVIDENCE

### A.  Personal and Vocational Evidence

Lavenia was born in 1988 and was 29 years old on his alleged disability onset date.  Tr. 55.  He has at least a high school education and past relevant as a delivery worker/kitchen helper and forklift operator/order selector/warehouse worker.  Tr. 55.

### B.  Relevant Medical Evidence[3]

On April 2, 2018, Lavenia went to the emergency room for acute midline low back pain with bilateral sciatica that had started the day before.  Tr. 346.  His pain was constant and worse with any kind of movement and it was hard to get up.  Tr. 346.  He denied injury or trauma but stated that he

---

[2]  Lavenia also asserted a Separation of Powers argument (Doc. No. 13, pp. 20-25) but he withdrew that argument (Doc. No. 18).

[3]  The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  The Court also notes that Lavenia cited to the Page ID# in his brief, instead of the transcript number.  See Doc. 5, p. 3 ("[C]itations to the Transcript should refer to the page number indicated on the lower right hand corner of the document, and NOT to the PageID # at the top of the document.") (emphasis removed).

worked a job doing physical labor that required him to constantly lift 50-pound bags.  Tr. 346.  He had had flare-ups like this in the past that typically resolved in a few days but this time his pain was worse than usual.  Tr. 346.  He was prescribed pain medication and a muscle relaxant and told to follow up with his primary care physician the next few days if he continued to have back pain.  Tr. 346.  He was able to ambulate upon discharge.  Tr. 346.

On April 4, 2018, Lavenia saw Nurse Practitioner Ashley Degutis to establish care.  Tr. 404. Degutis ordered an intra-muscular injection for back pain.  Tr. 404.  An MRI taken April 24 showed disc desiccation at L4-5 and L5-S1 with mild concentric disc displacement; mild bilateral lateral recess and neural foraminal narrowing at L4-5; at L5-S1, there was mild facet arthropathy that contributed to mild bilateral lateral recess and neural foraminal narrowing; and no canal stenosis.  Tr. 412.

On May 3, 2018, Lavenia had a follow up with Degutis for back pain.  Tr. 413.  He stated that he needed to go back to work but that he was afraid he would get hurt.  Tr. 413.  Degutis agreed that he should not try to go back to his job lifting and tossing large sacks of feed until he consulted with a neurosurgeon.  Tr. 413.

On June 14, 2018, Lavenia saw Degutis for back pain, depression, and hypertension.  Tr. 421. He wanted to go back to work.  Tr. 421.  His back pain had improved but he still had persistent pain, which he described as numbness, in his low back radiating to both thighs.  Tr. 421.  He stated that he stood at his son's baseball practice for an hour "and it takes me a day and a half to recover.  It kills me." Tr. 421.  Degutis would not clear him to return to work, writing, "[Lavenia] has yet to consult with a neurosurgeon as he has been instructed/referred."  Tr. 421.  When Lavenia voiced concerns about losing his job soon when his FMLA ran out, Degutis stated, "[Lavenia] aware that we can discuss his return to work without restrictions if he consults with neurosurgery as discussed."  Tr. 421.  He presented with anxious/fearful thoughts, admitted increased depression, and was agreeable to start on a daily

3

antidepressant.  Tr. 421.  He was 5"10' tall and weighed 370.4 pounds.  Tr. 423.  He was assessed with low back pain and major depressive disorder, recurrent, moderate.  Tr. 424.  He was ordered, "consult with neurology ASAP."  Tr. 430.

Lavenia returned to Degutis on June 28, 2018.  Tr. 430.  His back pain was improving and he had not consulted with a neurosurgeon.  Tr. 430.  He had lost his job and requested he remain off work to retain his short-term disability.  Tr. 432.  Degutis wrote, "[Lavenia] has been referred and has chosen not to pay out of pocket to expedite the process."  Tr. 432.  He did not present as anxious or fearful, he had an appropriate mood and affect, and he denied any depression at that time.  Tr. 432, 434.  He weighed 373.5 pounds.  Tr. 433.

On July 26, 2018, Lavenia visited Degutis' office complaining of worsening back pain aggravated by bending and standing.  Tr. 446.  His pain was sharp and shooting.  Tr. 446.  He presented with a depressed mood associated with his back pain.  Tr. 446.

Later that day Lavenia saw a physician's assistant, Stephanie Young, to establish care for his thoracic and low back pain, which he had had for the last 5 years, worse the last 4 months.  Tr. 380.  He denied weakness when walking or numbness or tingling in his legs.  Tr. 380.  He stated that he had an injection that did not help and had tried prednisone, Norco, Aleve, and ibuprofen without relief.  Tr. 380.  He had not tried physical therapy or injections.  Tr. 380.  He reported needing help with most aspects of his care: he doesn't get dressed, he washes with difficulty, and he stayed in bed at least 50% of the time.  Tr. 380.  He could only lift very light weights and pain prevented him from walking more than ¼ mile, sitting longer than ½ hour, standing more than 20 minutes, going out often, and traveling more than 2 hours.  Tr. 380.  He woke up often while sleeping due to pain.  Tr. 380.  He rated his pain 10/10.  Tr. 380.  Upon exam, he weighed 376 pounds.  Tr. 381.  He was alert, oriented, and had a normal affect.  Tr. 381.  His gait was broad based and he had normal coordination.  Tr. 381.  He had pain in his right

4

thoracic spine and lumbar/sacral junction bilaterally; diffusely decreased lumbar range of motion in all directions and pain; his muscle mass appeared normal; he had no signs of instability or loss of range of motion in his lower extremities and full strength; negative straight leg raise testing; and intact reflexes and sensation.  Tr. 381.  Young ordered thoracic x-rays and physical therapy.  Tr. 381.

Thoracic x-rays taken August 10, 2018 showed no compression fracture and mild spondylitic spurring throughout the dorsal spine.  Tr. 375.

On August 16, 2018, Lavenia had a physical therapy evaluation for his thoracic back pain.  Tr. 350.  He described the incident that led to his ER visit in April: he had bent down and fell to the ground due to pain and his legs had also given out.  Tr. 350.  His pain was across his low back, it was constant, and it tended to be worse first thing in the morning.  Tr. 350.  He had no numbness or tingling in his lower extremities.  Tr. 350.  He also had intermittent central back pain.  Tr. 350.  He stated that he had had back pain for the last 10 years, on and off, and had been very active in sports and lifting weights.  Tr. 351.  He reported independence with his activities of daily living, his tolerance for household chores varied due to pain, and he could not tolerate grocery shopping.  Tr. 351.

On September 4, 2018, at his fourth physical therapy visit, he arrived with slight pain in his left lower back, 4/10, and stated that he had "felt great" since his last session but woke up that morning with back pain.  Tr. 359.  He reported doing his home exercises every couple of hours and good improvement with mid and lower back pain, prolonged standing, and sitting using a lumbar support.  Tr. 359, 360.  Overall, he reported 60% improvement since starting therapy.  Tr. 359.  At his next visit a week later he felt "very good."  Tr. 361.  He was noted to have had no lumbar pain upon arrival or during the visit, he was able to complete his exercises without pain returning, and the therapist noted that he would consider discharging Lavenia if he continued to report no pain during his return to function.  Tr. 363.

On October 11, 2018, Lavenia saw Physician's Assistant Young for a follow-up visit after he had completed his physical therapy.  Tr. 382.  He reported pain in his lower and upper back rated 6/10.  Tr. 382.  His exam findings were the same as his prior visit.  Tr. 383.  Young referred him to pain management and bariatrics and recommended that he see Dr. Barker for his obesity.  Tr. 384.  Young opined that his best chance at improving his pain without a surgery was to lose 175 pounds.  Tr. 384.

On October 31, 2018, Lavenia saw Nurse Degutis for a follow-up.  Tr. 461.  He did not present as anxious or fearful and stated that he had not been taking his Wellbutrin because he just stopped caring.  Tr. 461.  He stated, "I have accepted what I have to do.  It isn't ideal, but I will get my life back."  Tr. 461.  He denied the need for any depression medication.  Tr. 461.  With respect to his high cholesterol, he stated that he had changed his diet for a little while but then went back to his old ways.  Tr. 461.  Regarding his musculoskeletal pain, he stated that he had been instructed to lose weight "and the plan wi[ll] then be surgical intervention."  Tr. 461.

On December 4, 2018, Lavenia saw Ryan Wagner, Psy.D., for a psychological consultative exam.  Tr. 477-482.  When asked about the nature of his disability, Lavenia stated that he was about to have stomach surgery so he could have back surgery and had been told he had to lose 150-200 pounds.  Tr. 477.  He can't stand to be around people.  Tr. 477.  When asked to describe his emotional functioning, he stated that he is depressed most days characterized by decreased enjoyment, withdrawal from others, crying spells, decreased attention and concentration, low motivation, and feelings of helplessness.  Tr. 478.  He was often worried, tense, and on edge, and he had never received mental health treatment.  Tr. 478.  Upon exam, he was morbidly obese and winced as he got in and out of chairs and when he walked.  Tr. 479.  He had a downcast facial expression, restricted emotional range, and spoke in negative terms about various aspects of life.  Tr. 479.  His thought content was clear and logical.  Tr. 479.  He appeared tense and on edge throughout the exam and approached Dr. Wagner in a

6

suspicious manner; for example, he became worried that Dr. Wagner was going to hospitalize him when Dr. Wagner asked if he had ever been hospitalized and, upon learning that he would not be hospitalized, he stated, "good because I was about to leave" and appeared relieved when the exam was over.  Tr. 479. Dr. Wagner diagnosed major depressive disorder, recurrent, moderate, and unspecified anxiety disorder. Tr. 480.  He concluded that Lavenia's mental health prognosis was "guarded" with appropriate interventions.  Tr. 480.  He opined that Lavenia would have difficulty understanding instructions; some difficulty maintaining attention and focus; his described depressive and anxiety symptoms may compromise his ability to respond to work pressures and lead to the increased likelihood of agitation and anxiety attacks; and he presented with a low to average cognitive ability to adapt to work pressures.  Tr. 481-482.

On December 18, 2018, Lavenia had a pain management visit with Aleksay Prok, M.D.  Tr. 486. Dr. Prok wrote that Lavenia was not a surgical candidate according to his notes but that Lavenia was under the impression that after bariatric surgery he would have a fusion surgery.  Tr. 486.  Upon exam he had musculoskeletal tenderness and was "walking normal."  Tr. 486.  He weighed 388 pounds and Dr. Prok stated that he was not comfortable performing any procedures until Lavenia lost 40-50 pounds and stated that he needed to consult with bariatric surgery and to have a functional capacity evaluation. Tr. 489.

On February 1, 2019, Lavenia saw Occupational Therapist Joshua Line for a functional capacity evaluation.  Tr. 331-36.  Line concluded that Lavenia would not be able to participate in productive employment "at this time" due to his pain and limited strength and range of motion.  Tr. 331.  Lavenia understood that his weight will continue to be a limiting factor in his recovery and he was very willing to address that in order to be able to address his back condition.  Tr. 331.  Lavenia described pain from his tailbone up to his shoulder blade area and excruciating pain in his shoulder blade area when standing

and stated, "If I could get the shoulder blade taken care of I really think that I could go back to work somewhere." Tr. 332. He could sit or stand for approximately 30 minutes at a time. Tr. 332. Upon exam, he had tenderness in his medial scapular region and a 75% loss of flexion, extension, and rotation bilaterally in his thoracic spine. Tr. 332. He had an antalgic gait with decreased step length in both lower extremities. Tr. 334. He could occasionally lift 10 pounds waist to shoulder and 12 pounds shoulder to overhead but was unable to complete a lift from a 12-inch height to waist due to pain and instability of his legs; he stated that his legs felt very unstable when squatting to lift. Tr. 335. He could rarely bend, squat, climb, and kneel and could occasionally reach. Tr. 335. A whole-body range of motion test was not conducted due to Lavenia's increased pain. Tr. 335. Lavenia expressed his goal as "I just want my life back. I don't want to sit around. I want to work, but I just really don't know what I can do. If I could sit, I would deliver pizzas. I just can't sit." Tr. 336. Line stated that Lavenia's rehab potential was good based on his prior level of function. Tr. 336.

On February 19, 2019, Lavenia went to the emergency room for back pain that had progressively gotten worse over the last 8 days and was worse with walking. Tr. 519. Upon exam he was in no distress, had a normal mood and affect, a steady gait, and pain with palpation in the lumbar/sacral region and with right straight leg raise testing. Tr. 522. A lumbar x-ray showed mild disc space narrowing at L5-S1 and suspected L5 spondylolysis with minimal anterolisthesis at L5-S1. Tr. 525.

On February 25, 2019, an x-ray of Lavenia's lumbosacral spine showed mild degenerative disc disease with grade 1 spondylolisthesis at L4-L5. Tr. 533-534.

On April 4, 2019, Lavenia had a follow-up with Nurse Degutis, complaining of worsening back pain. Tr. 535. He denied the need for any treatment of anxiety or depression, stating that he felt better and things were going to get better. Tr. 535.

On August 7, 2019, Lavenia went to the emergency room concerned about an injury to his right

shoulder when he "jumped out of bed" after hearing his son cry and felt something in his shoulder from pushing himself up.  Tr. 680.  An x-ray of his right shoulder was normal.  Tr. 685.

On August 23, 2019, Lavenia saw Degutis for a follow up.  Tr. 547.  He expressed frustration at having been denied disability and stated, "I am going to apply one more time, if not I have got to work."  Tr. 547.

On December 4, 2019, Lavenia saw primary care physician Charles Thompson, M.D., to establish care and to request a sleep study.  Tr. 640-643.  He reported back pain that was manageable on Percocet.  Tr. 640.  His diet was poor; he drank 6-8 cans of soda a day, ate steak 2-3 times a week, and eats 25 chicken wings on Sundays during football season.  Tr. 640.  He ate minimal fruits and vegetables and performed no physical activity.  Tr. 640.  He weighed 411 pounds and was assessed as morbidly obese.  Tr. 642.  He had a follow-up on January 21, 2020, to discuss his recent diabetes diagnosis.  Tr. 620.  He had cut out soda, was trying to eliminate sugars, and he was eating a lot of fish and green vegetables.  Tr. 620.  Upon exam, he weighed 418 pounds and had a normal musculoskeletal range of motion.  Tr. 622.

On January 30, 2020, Lavenia saw Dr. Prok for a follow-up, reporting the same symptoms: back pain exacerbated by bending, walking, standing, coughing and sneezing.  Tr. 568.  Upon exam, he had back tenderness and an antalgic gait.  Tr. 571.

On February 25, 2020, Lavenia had a weight loss consultation with Bruce Barker, M.D.  Tr. 730.  He stated that he struggled with cravings and tended to be a stress eater.  Tr. 730.  He reported that his moods were a "bit of a challenge" and he scored a 14 on a Beck Depression Inventory.  Tr. 727.  Upon exam, he weighed 419 pounds and had tenderness in his low back, normal strength, normal reflexes, normal muscle tone, and normal coordination and gait.  Tr. 730.  Dr. Barker diagnosed atypical eating disorder and prescribed Wellbutrin.  Tr. 731.  Dr. Barker provided him with a personalized exercise

regimen, discussed behavioral and lifestyle changes, including diet, and referred him to aquatic therapy. Tr. 731.

On March 10, 2020, Lavenia saw Dr. Thompson complaining of "an apparent flare of sciatica from a stress echo." Tr. 755.  Dr. Thompson prescribed prednisone, an MRI, and advised he call physical therapy, which Lavenia had not started yet.  Tr. 755.  He also provided a prescription for a wheeled walker due to Lavenia's statement that he was unable to support himself due to back pain.  Tr. 755.  Lavenia had not scheduled physical therapy yet; he was hoping to have another MRI first to further evaluate his symptoms.  Tr. 756.  He advised feeling depressed about those issues and Dr. Thompson stated that Lavenia's depression was currently not controlled and increased his Wellbutrin.  Tr. 755, 756. Upon exam, he weighed 423 pounds.  Tr. 758.

On March 11, 2020, Lavenia returned to Dr. Barker for a weight check.  Tr. 714.  He reported that his eating habits had changed and he was down to three meals a day and had stopped drinking soda. Tr. 714.  His energy level was poor, he had an increase in cravings and hunger, and he had trouble sticking to his diet and exercise protocols on a consistent basis.  Tr. 714.  Stress levels were a challenge. Tr. 714.

On April 15, 2020, Lavenia had a tele-med appointment with Dr. Barker and again stated that his cravings and hunger levels had increased, and, as a result, he was struggling to adhere to the diet and exercise regimen.  Tr. 701.  His stress levels were manageable, his moods were stable, and he was tolerating his medications.  Tr. 701.  Dr. Barker adjusted his medications and advised Lavenia to work on his protein/carb ratio and do regular exercise.  Tr. 701.

On May 26, 2020, Lavenia saw Dr. Thompson reporting pain in his lower and thoracic back.  Tr. 741.  He had pain in the past with bilateral sciatica but not recently, and the pain in his thoracic area was intense.  Tr. 741.  He had gotten worse due to all the inactivity from the Covid pandemic.  Tr. 741.  Dr.

10

Thompson assessed chronic midline thoracic back pain, not currently controlled, continued his medications, and referred him to physical therapy.  Tr. 742.

On June 16, 2020, Dr. Thompson completed a Primary Care Medical Statement on Lavenia's behalf.  Tr. 789-790.  He listed his diagnoses as chronic midline thoracic back pain and chronic low back pain and his symptoms were back pain with occasional sciatica.  Tr. 789.  He had no neurological deficits and reports of subjective debilitating pain.  Tr. 789.  He could stand/walk for less than 2 hours and sit for about 2 hours; needed to change positions at will, including periods of walking around (every 90 minutes for 5 minutes at a time); and would need 1-3 unscheduled breaks throughout the day to rest for about 20 minutes before returning to work.  Tr. 789.  He did not need an assistive device.  Tr. 790. He would be off-task at least 25% of a typical workday, he had good days and bad days, and he would be absent more than 4 times a month.  Tr. 790.  Dr. Thompson stated that the earliest date his description of Lavenia's symptoms and limitations began was the same day he filled out the questionnaire—June 16, 2020.  Tr. 790.

On June 24, 2020, a lumbar MRI showed a broad-based disc protrusion at L4-L5 and mild bilateral foraminal stenosis, and a disc bulge at L5-S1 and mild bilateral neural foraminal stenosis.  Tr. 812.  An MRI of his thoracic spine showed no disc herniations, narrowing, fracture, or subluxation.  Tr. 816.

On August 4, 2020, Lavenia followed up with Dr. Thompson.  Tr. 823.  He stated that he was watching his diet closely, eating well, and had eliminated soda from his diet.  Tr. 823.  Upon exam, he weighed 420 pounds.  Tr. 824.

## C.    State Agency Reports

On December 10, 2018, Abraham Mikalov. M.D., reviewed Lavenia's record and opined that he could perform light work with postural and environmental limitations.  Tr. 148-149.  On July 21, 2019,

Mehr Siddiqui, M.D., found that Lavenia could perform a reduced range of light work.  Tr. 168-169.

On December 14, 2018, Dr. Karen Terry, Ph.D., reviewed Lavenia's record and opined that he would likely to have some difficulty maintaining attention for extended periods of time and carrying out detailed instructions, could perform routine tasks with no strict production quotas, would likely have some difficulty interacting with the general public and accepting instructions and criticism from supervisors, should not be required to have constant, direct over-the-shoulder supervision and correction/criticism needs to be presented in a constructive manner, and he could perform job duties that remained relatively static with any necessary changes occurring infrequently and be adequately and easily explained in advance.  Tr. 150-151.  On July 21, 2019, Karla Delcour, Ph.D., adopted Dr. Terry's opinion. Tr. 171-172.

**D.      Hearing Testimony**

During the August 11, 2020 hearing, Lavenia testified to the following:

- He lives in a first floor apartment.  Tr. 84.  He has a driver's license and drives, but not very often; when he goes anywhere his father or girlfriend will drive.  Tr. 84.

- He used to work delivering pizzas and then as a forklift driver at a feed warehouse.  Tr. 84-86.  He last worked in 2018, when he injured his back when bending down to pick up a toy and his legs gave out.  Tr. 87.  At that time he was 5'9" and weighed about 380-390 pounds.  Tr. 87.  At his most recent doctor appointment he weighed 418 pounds.  Tr. 87.  When asked about being referred to bariatrics due to his diet not working out, he stated that he had not yet been referred to bariatrics as he still sees a dietician who is trying to help him lose weight with a specialized diet and medication.  Tr. 87-88.  When asked about the record showing he had difficulty eating fried foods and soda, he agreed that he used to drink 12 cans of regular soda a day but he no longer drank soda.  Tr. 88.  He was unsure when he started his new diet, but it was months ago, prior to the Covid-19 pandemic.  Tr. 88.  He has to lose weight before he can have surgery on his back.  Tr. 88.

- When asked to describe his back impairment, he stated that he had extreme pain; he can't sit and he can't stand for long periods of time.  Tr. 88.  When he sits his thighs and tailbone hurt.  Tr. 88.  He needs help showering and he spends most of his days lying down.  Tr. 88-89.  He takes medication: morphine, which helped more than his prior medication (Percocet), and Gabapentin.  Tr. 88-89.  With morphine he is still in pain, it's just not as painful; he still can't perform any functions or activities.  Tr. 89.  When asked if he could perform a sit-down job, he said no because of back and leg pain.  Tr. 89.

- He sees a dietary specialist, Dr. Barker, who diagnosed him with an atypical eating disorder, but he does not know what that involves.  Tr. 90.  When asked if he had noticed any progress since being on the diet he answered no.  Tr. 90.  When asked if he had lost weight, he stated that he had lost 18 pounds.  Tr. 90.

- His primary care doctor had prescribed him a walker to help him get around; his leg is really bad and there are days when he can't even get out of bed.  Tr. 90.  Sometimes he used it 3-4 times a week; he has better days where he can move a little better, and days when he uses it all day.  Tr. 91.  His girlfriend has to help him shower and use the toilet.  Tr. 90.  When she goes to work, his father, who lives next door, comes over to help him.  Tr. 90.

The VE testified that Lavenia had past composite work as a delivery worker/kitchen helper and forklift operator/order selector/warehouse worker.  Tr. 93-94.  The ALJ asked the VE whether a hypothetical individual with the same age, education and work experience as Lavenia could perform his past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below.  Tr. 94-95.  The VE answered that such an individual could not perform Lavenia's past work but could perform the following representative jobs in the economy: assembler, inspector, and sorter.  Tr. 95.  Lavenia's attorney asked the VE whether an individual could perform work if he needed additional breaks and the VE answered that such an individual would need an accommodation.  Tr. 95-96.  When asked about customary off-task behavior and absenteeism, the VE stated that off task behavior over 10% of the day or a worker who was absent or late more than once a month will not be tolerated.  Tr. 96.

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).  A claimant is entitled to a POD only if: (1) he

13

had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Lavenia was insured on the earliest possible disability onset date, April 1, 2018, and remained insured through December 21, 2023, his date last insured ("DLI.").  Tr. 40.  Therefore, in order to be entitled to POD and DIB, Lavenia must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement

to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2.   The claimant has not engaged in substantial gainful activity since April 1, 2018, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.   The claimant has the following severe impairments: morbid obesity, degenerative disc disease of the lumbar and thoracic spine with mild concentric disc displacement, obstructive sleep apnea, atypical eating disorder, major depressive disorder, unspecified anxiety disorder (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except lift no more than 20 pounds occasionally, 10 pounds frequently; standing and/or walking limited to 4 hours in an 8 hour day; sitting approximately 6 hours in an 8 hour day; sitting and standing no more than 30 minutes at a time with 1-3 minutes to change positions; occasional climbing of ramps and stairs but never ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch; never crawl; never work at unprotected heights or around dangerous machinery, and never operate a motor vehicle; can perform routine tasks that do not require strict production quotas and do not require fast production rate pace; occasional interaction with coworkers but no tandem or shared tasks; occasional interaction with supervisors with no over the shoulder supervision; occasional interaction with the public but not in a customer service capacity; relatively static work environment with any necessary changes occurring infrequently and easily explained in advance.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on December **, 1988 and was 29 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant

is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2018, through the date of this decision (20 CFR 404.1520(g)).

Tr. 42-56.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)

16

("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

### A. The ALJ's finding regarding Lavenia's noncompliance with medical advice is supported by substantial evidence

Lavenia argues that the ALJ erred when discussing his noncompliance with medical advice. Doc. No. 13, p. 10.  He asserts that the ALJ stated that his history is "significant for noncompliance with

17

orders to lose weight, diet, increase activity, trying physical therapy again, and see bariatrics for weight loss" and complains that the ALJ used a "dismissive and disapproving tone" throughout her decision. Doc. No. 13, p. 10.  He alleges, "The ALJ seemed to take great issue with the fact that Mr. Lavenia is a young man who has struggled with an eating disorder which has resulted in morbid obesity" and that the ALJ's "conclusions all seem to relate back to this point and that is not an accurate representation of what is reflected in the medical evidence of record." Doc. No. 13, p. 10.  In support, he cites portions of the ALJ's decision in which, he states, the ALJ used a dismissive tone or discounted his efforts to lose weight and submits that those discussions are inconsistent with the ALJ's finding that Lavenia's atypical eating disorder was a severe impairment.  Doc. No. 13, pp. 10-12.  Defendant submits that the ALJ cited proper instances of Lavenia's noncompliance with treatment, including his failure to follow referrals for bariatrics and physical therapy.  Doc. No. 17, pp. 21-22.

As an initial matter, the ALJ's repeated reference to Lavenia's morbid obesity, and whether he was compliant with treatment to lose weight, is warranted by the record because, as the ALJ stated, Lavenia's back pain was exacerbated by his obesity.  *See*, *e.g.*, Tr. 47 (ALJ commenting that Lavenia was told in 2018 by a physician's assistant at his neurologist's office and his pain management physician that he needed to lose significant weight to help his back pain and he was referred to bariatrics); Tr. 48 (ALJ remarking pain management would not perform procedures on Lavenia's back until he lost weight).

Although the ALJ could have used a less aggressive tone when describing Lavenia's non-compliant diet, and accounted for his eating disorder as the cause, the fact remains that Lavenia's non-compliant diet was one of three reasons the ALJ cited when she found him to be non-compliant with treatment to lose weight.  And the undersigned finds that the other two reasons, discussed below, are proper and are supported by substantial evidence.

18

First, the ALJ stated that Lavenia was non-compliant with treatment because he had been referred to bariatrics on a regular basis since 2018 but he had not gone.  Tr. 47.  His unwillingness to consult with bariatrics despite the fact that he was morbidly obese at the time of his first referral in 2018 (Tr. 383 (376 pounds, BMI 55.61)) is non-compliance with treatment.  He continued to gain weight and continued to ignore referrals to bariatrics.  Tr. 48, 49.  At the time of the hearing, about two years later in August 2020, he still had not consulted with bariatrics and his weight had increased to 418 pounds.  Tr. 47.  Lavenia does not challenge the ALJ's recitation of that evidence.  He concedes that Lavenia had struggled with his weight for a long time (Doc. No. 13, p. 11) but provides no explanation for why he did not follow recommendations and referrals to consult bariatrics.

Second, the ALJ cited the fact that Lavenia did not follow physical therapy referrals, a finding that Lavenia also does not challenge.  *See*, *e.g.*, Tr. 50.  The ALJ pointed out that the one time he did participate in physical therapy, at the end of August 2018, he made "significant improvements": he could complete his home exercises every couple hours with good improvement in his mid and low back pain; a lumbar support while sitting gave "good improvement"; he reported that he was at 60% improvement since starting physical therapy with most pain while bending and twisting; and by September 18, he reported feeling "very good" with pain at 0/10.  Tr. 47.  He "was able to complete his return to function and work weighted shelf lifts with no return of symptoms and minimal verbal cues for proper body mechanics during squatting" and his goals were updated, including discharge, if he continued "with abolished pain during return to function."  Tr. 47.  The ALJ commented that there were no notes showing additional visits.  Tr. 47.  The ALJ concluded that, with that "conservative treatment," Lavenia "quickly showed evidence of improved functioning and reduced symptoms."  Tr. 47.  Despite his good results, the ALJ observed, Lavenia told the Agency that his physical therapy "didn't help at all."  Tr. 48, 141.  In addition, the ALJ cited a rehabilitation functional capacity evaluation from

19

February 2019 in which the occupational therapist determined that Lavenia's rehabilitation potential was "good."  Tr. 48.  In other words, physical therapy helped a great deal and had the potential to help again, and yet, the ALJ found, Lavenia did not keep up with his home exercises, did very little activity, and did not follow recommendations to go to further therapy.  Tr. 47.

Lavenia argues that the ALJ ignored the impact that his mental health impairments had on his ability to lose weight.  Doc. No. 13, pp. 12-13.  But he does not describe how his mental health symptoms effected his failure to consult bariatrics or go to physical therapy.  The record shows that Lavenia attended regular medical appointments and sought emergency treatment when necessary, *i.e.*, his mental health symptoms did not prevent him from going to medical appointments.  He does not explain how medical appointments for bariatrics and physical therapy are different.

Finally, Lavenia argues that the ALJ "completely mischaracterizes" a statement he made to his doctor.  The ALJ wrote, "the claimant reported being denied for disability and stated, 'I am going to apply one more time, if not I have got to work,' [ ] which suggests that he is less limited than alleged in disability reports."  Tr. 49.  Lavenia submits, "This is an incredibly cynical and narrow assessment of that statement.  Mr. Lavenia is not saying he can easily work, he is simply acknowledging the fact that he will have no other option but to push himself and work through his chronic pain if he cannot obtain disability benefits."  Doc. No. 13, p. 13.  The undersigned finds that ALJ did not mischaracterize Lavenia's statement; her comment is a reasonable interpretation of it.  Thus, Lavenia's challenge in that respect is an attempt to ask the Court to reweigh the evidence, which the Court cannot do.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility).

The undersigned finds that the ALJ's decision regarding Lavenia's noncompliance with medical advice is supported by substantial evidence and should be affirmed.

20

**B. The ALJ's evaluation of Line's opinion is supported by substantial evidence**

Lavenia challenges the ALJ's characterization of the functional capacity evaluation performed by occupational therapist Joshua Line.  Doc. No. 13, p. 14.  The ALJ wrote, in relevant part,

> He had thoracic and right shoulder range of motion loss, but normal cervical spine range of motion with shoulder strength near normal limits at 4+, normal special testing, and normal findings as to his elbows, wrists and hands. He had an antalgic gait with decreased step length of the lower extremities. While his knees were normal, he had some range of motion deficits in both hips. He completed the 5-minute walk test but ambulated 470 feet in 5 minutes. He demonstrated the sedentary capacity of lifting, alleging that he legs felt unstable when squatting to lift. As a result, he was limited to occasional reach, but rare bend, squat, climb and kneel. He had grip strength averaging 97 pounds. The physical therapist determined that physical rehabilitation was a medical necessity (1F).

Tr. 48.  Lavenia complains that the ALJ's reference to his "alleging" that his legs felt unstable "is another example of the ALJ's dismissive reaction concerning Mr. Lavenia's impairments and complaints of their effects on his ability to complete normal tasks."  Doc. No. 13, p. 14.  But the ALJ was repeating what the occupational therapist had written: "Client reports that his legs feel very unstable when squatting to lift."  Tr. 335.

Lavenia cites findings from Line's evaluation, Doc. No. 13, pp. 13-14, but does not identify an error that the ALJ made.  The ALJ found that Line's opinion—Lavenia was limited to occasional reaching and rare bending, squatting, climbing and kneeling—was consistent with a reduced light-sedentary residual functional capacity with postural limitations and explained,

> [Line's] overall opinion is found persuasive to that extent as supported by the findings and generally consistent with the claimant's treatment history, findings on exam, imaging and testing, and his level of activity. The vocational expert indicated that the claimant's residual functional capacity is closer to a sedentary residual functional capacity than the light exertional level. The claimant had done well with earlier physical therapy, which he did deny, but this offers support for the good rehabilitation level found by this evaluating physical therapist. Some additional limitations were included in the residual functional capacity based on other evidence as explained later in this decision.

Tr. 48.

Lavenia contends, "there are an abundance of medical records that reflect more extreme physical

21

limitations outlined in the functional capacity evaluation Mr. Line filled out."  Doc. No. 13, p. 14.  He cites Dr. Thompson's opinion, notes from visits with Dr. Thompson, and his imaging results.  Doc. No. 13, p. 14-16.  But the ALJ did not find Dr. Thompson's opinion to be persuasive, as the undersigned discusses in the next section.  With respect to his March 10, 2020 visit, Lavenia asserts that Dr. Thompson prescribed a wheeled walker because Lavenia stated that he could not support himself due to the amount of back pain he was experiencing; Dr. Thompson noted that he was having to walk hunched forward to try to help with his back pain; and that muscle relaxers had provided no relief.  Doc. No. 13, p. 15.  But Dr. Thompson did not observe Lavenia walking hunched forward; Lavenia reported that he had had to walk hunched forward when he left a recent stress echo he had had.  Tr. 756.  In addition, Lavenia had stated that muscle relaxants hadn't helped "in the past."  Tr. 756.  In any event, Dr. Thompson had noted that Lavenia had not scheduled physical therapy yet, as instructed, and was given a phone number to call physical therapy, as the ALJ noted.  Tr. 50, 755-756.  With respect to his May 26, 2020 visit with Dr. Thompson, Lavenia asserts that he had reported that he had intense pain in his thoracic area and low back pain that had worsened recently and his chronic back pain was assessed as "not currently controlled."  Doc. No. 13, p. 15.  But Dr. Thompson had stated that his pain had worsened recently due to "all the inactivity from COVID pandemic" and referred him to physical therapy.  Tr. 741.  The fact that his back pain had worsened due to inactivity is consistent with the ALJ's finding that activity and physical therapy helped Lavenia's back pain and Line's opinion that he had a good prognosis for rehabilitative therapy.

Finally, Lavenia cites his April 2018 MRI showing degenerative disc changes at L4-L5 and L5-S1 with mild disc bulging at L5-S1 without central canal or foraminal stenosis; his February 25, 2019 x-ray of his lumbosacral spine showing mild degenerative disc disease with grade 1 spondylolisthesis at L4-L5; and his lumbar MRI lumbar spine from June 24, 2020 showing broad-based disc protrusion at

22

L4-L5, mild bilateral foraminal stenosis, a disc bulge at L5-S1, and mild bilateral neural foraminal

stenosis.  Doc. No. 13, pp. 15-16.  The ALJ considered that evidence (Tr. 46, 48, 49, 50), and Lavenia

does not explain how it undermines the ALJ's conclusion regarding Line's opinion.

The undersigned finds that the ALJ's evaluation of Line's opinion is supported by substantial

evidence.

## C. The ALJ did not err when evaluating Dr. Thompson's opinion

Lavenia argues that the ALJ erred when he evaluated the opinion of his treating source, Dr.

Thompson.  Doc. No. 13, p. 16.  Under the regulations, the Commissioner will not "defer or give any

specific evidentiary weight, including controlling weight, to any medical opinions[.]"  20 C.F.R. §

404.1520c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and

prior administrative medical findings using the factors set forth in the regulations: (1) supportability; (2)

consistency; (3) relationship with the claimant, including length of the treatment relationship, frequency

of examinations, purpose of the treatment relationship, extent of the treatment relationship, and

examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence

showing a medical source has familiarity with the other evidence in the claim or an understanding of the

agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§ 404.1520c(a), (c)(1)-

(5); 416.920c(a), (c)(1)-(5).  Supportability and consistency are the most important factors, and the ALJ

will articulate how persuasive the medical opinions are.  20 C.F.R. §§ 404.1520c(b), 416.920c(b).

Lavenia's description of the ALJ's evaluation of Dr. Thompson's opinion as "very brief" is

belied by the record; the ALJ spent almost a full page evaluating Dr. Thompson's opinion.  Doc. No. 13,

p. 17; Tr. 51-52.  Lavenia asserts, "the ALJ never really addresses" the supportability factor "beyond

stating that Dr. Thompson's opinions are not supported by his own records."  Doc. No. 13, p. 18.  But

the ALJ detailed Dr. Thompson's records, including Lavenia's normal or mild exam findings, imaging

23

results, his referral to physical therapy (and Lavenia's noncompliance), and commented that Dr. Thompson stated that his assessed limitations began on June 16, 2020 without his records showing that Lavenia's symptoms worsened since Dr. Thompson first saw him on December 4, 2019.  Tr. 51.  Thus, the ALJ "addressed" the supportability factor when he discussed Dr. Thompson's treatment notes and found that they did not support his opinion.

Lavenia cites evidence in the record that he believes supports Dr. Thompson's opinion.  Doc. No. 13, p. 18 (citing Dr. Thompson's treatment notes from March 10 and May 26, 2020, and his imaging results).  For the same reasons described in the previous section regarding Line's opinion, that evidence does not undercut the substantial evidence supporting the ALJ's evaluation of Dr. Thompson's opinion.

Lavenia submits that the ALJ failed to evaluate Dr. Thompson's opinion for consistency.  Doc. No. 13, p. 19.  The ALJ discussed the consistency factor when evaluating Dr. Thompson's opinion:

> There is nothing in the doctor's own records or any records that would support the extent of limitation indicated in this medical source statement with new limitations as of 6/16/20. The record supports no worsening of the claimant's functional ability. The claimant testified as to no improvement with his dietary adjustments but had lost only a little weight, and was still up from the weight as of the alleged onset date. The records support continued noncompliance with treatment thought to be most helpful for the claimant's pain, namely weight loss, with repeat referrals to physical therapy and bariatrics with the claimant not compliant. Thus, given the lack of support for the doctor's limitations in his own notes and the inconsistencies as to the extent of limitations supported by the overall record, this is found unpersuasive.

Tr. 51-52.  Lavenia cites evidence from the record that he believes supports his argument that the record as a whole was consistent with Dr. Thompson's opinion.  Doc. No. 13, pp. 19-20.  His reports of pain, stated functional limitations, and his inability to lose weight through diet are no answer to the ALJ's finding that the record shows he was referred to bariatrics and physical therapy to help with pain but did not go.  Liner's functional capacity evaluation does not help Lavenia's argument either, because Liner found that Lavenia had a good rehabilitation potential.  The undersigned finds that the ALJ's evaluation of Dr. Thompson's opinion is supported by substantial evidence.

24

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

**IT IS SO ORDERED.**

Date: March 10, 2022

 _s/ Jonathan Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).**

25